**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-2316**

GURPINDER S. OTHI,

             Petitioner,

       v.

ERIC H. HOLDER, JR., Attorney General,

             Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 20, 2013        Decided: October 29, 2013

Before NIEMEYER and AGEE, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Petition denied by published opinion. Judge Agee wrote the opinion, in which Judge Niemeyer and Senior Judge Hamilton joined.

**ARGUED:** Jonathan Y. Ai, AI & ASSOCIATES, P.C., Rockville, Maryland, for Petitioner. Walter Bocchini, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Stuart F. Delery, Principal Deputy Assistant Attorney General, Linda S. Wernery, Assistant Director, Civil Division, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

AGEE, Circuit Judge:

In his petition for review, Gurpinder Othi seeks to reverse the order of the Board of Immigration Appeals ("the Board") affirming the immigration judge's ("IJ") order that Othi be removed to India. A lawful permanent resident ("LPR") of the United States, Othi was deemed an inadmissible arriving alien upon his return from a 17-day overseas trip. Othi argues that he did not seek admission -- and therefore was not subject to removal proceedings -- when he returned to the United States from abroad. For the reasons that follow, we deny the petition for review and affirm the Board's decision.

I.

A.

Othi is a native and citizen of India who gained LPR status when he entered the United States in 1983. In 1995, Othi was arrested and convicted of theft. Two years later, he was arrested and convicted of possession of cannabis. And in 1999, Othi was found guilty of second-degree murder, receiving a 12-year prison sentence.

Othi had travelled to India in early 2011 to get married, and he returned there in December 2011 to visit his new wife. On January 11, 2012, after 17 days outside the country, Othi returned to the United States. Upon inspection at the airport

2

of entry, a border agent referred Othi for secondary inspection when his name appeared on a watch list. Border agents obtained Othi's criminal record during that secondary inspection, and he admitted his prior arrests and convictions.

B.

The Department of Homeland Security initiated removal proceedings against Othi on January 17, 2012. The Notice to Appear alleged that Othi was an arriving alien[1] who was removable on three grounds: (1) his prior conviction for a crime of moral turpitude, see 8 U.S.C. § 1182(a)(2)(A)(i)(I); (2) his prior conviction under a law relating to controlled substances, see id. § 1182(a)(2)(A)(i)(II); and (3) his prior convictions of two or more crimes having aggregate sentences of five years or more, see 8 U.S.C. § 1182(a)(2)(B). The notice specifically cited Othi's theft, marijuana, and murder convictions.

Othi challenged the removal proceedings on several grounds, but only one -- concerning his status as an arriving alien -- is raised on appeal. In particular, Othi argued that he was not an arriving alien because he never intended his trip abroad to

---

[1] An arriving alien includes "an applicant for admission coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1001.1(q). If Othi was not "seeking an admission" at the time of his return, then he was not an arriving alien.

3

meaningfully interrupt his permanent residence. In support, Othi cited Rosenberg v. Fleuti, 374 U.S. 449 (1963), which construed a prior version of the statute defining admission, 8 U.S.C. § 1101(a)(13). Under Fleuti, LPRs were permitted to take "innocent, casual, and brief" trips abroad without having to seek readmission. Id. at 462. In addition, Othi alleged that a removal premised on his arriving-alien status violated his due process rights.

The IJ ultimately found that Othi was removable as an arriving alien and rejected his Fleuti-based argument. Relying on the text of the applicable statute, 8 U.S.C. § 1101(a)(13)(C)(v), and a decision of the Board holding that Fleuti had been statutorily superseded, In re Collado-Munoz, 21 I. & N. Dec. 1061, 1065-66 (B.I.A. 1998), the IJ deemed Othi an arriving alien. After denying Othi's request for a discretionary waiver of inadmissibility, the IJ ordered him removed from the United States.

C.

Othi appealed to the Board, arguing again that he was not an arriving alien because his departure was innocent, casual and brief under Fleuti. He also repeated his argument that removal violated his due process rights.

4

The Board was unconvinced.  Congress, the Board observed, had amended the statute at issue in Fleuti in the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") of 1996.  In the Board's view, LPRs who commit offenses like those committed by Othi are always treated as arriving aliens under the new statute and subject to removal.  The Board further noted that all the federal circuit courts that had considered the Fleuti issue had unanimously affirmed the Board's viewpoint.  Consequently, the Board rejected Othi's Fleuti argument, as well as his constitutional claims, and affirmed the IJ's order of removal.

Othi then filed a timely petition for review to this Court.  We have jurisdiction to review the order of removal under 8 U.S.C. § 1252.

II.

In considering Othi's petition for review, we must first determine how IIRIRA applies to him and whether the Supreme Court's earlier decision in Fleuti impacts that analysis.  The Board determined that Fleuti had been statutorily superseded, and we review that legal conclusion de novo.  See Leiba v. Holder, 699 F.3d 346, 348 (4th Cir. 2012).  "We review factual findings for substantial evidence, which exists unless the record would compel any reasonable adjudicator to conclude the

5

contrary." Viegas v. Holder, 699 F.3d 798, 801 (4th Cir. 2012). And where, as here, "the [Board] has adopted and supplemented the [IJ]'s decision, we review both rulings and accord them appropriate deference." Id. (internal quotation marks and alterations omitted).

A.

"Before IIRIRA's passage, United States immigration law established two types of proceedings in which aliens [could] be denied the hospitality of the United States: deportation hearings and exclusion hearings." Vartelas v. Holder, 132 S. Ct. 1479, 1484 (2012) (internal quotation marks omitted). "Exclusion hearings were held for certain aliens seeking entry to the United States, and deportation hearings were held for certain aliens who had already entered the country." Id. Practically speaking, the distinction between aliens seeking "entry" and aliens not seeking "entry" was significant, as different substantive and procedural rules applied in each context. See Landon v. Plasencia, 459 U.S. 21, 25-27 (1982) (describing differences between the proceedings). Exclusion proceedings, for instance, were considered "more summary" than deportation hearings. Martinez v. Attorney Gen. of U.S., 693 F.3d 408, 413 n.5 (3d Cir. 2012) (internal quotation marks omitted). For purposes of our review, it is sufficient to

6

recognize that "[t]hose physically present in the country . . . had advantages over those seeking 'entry.'" Lezama-Garcia v. Holder, 666 F.3d 518, 526 (9th Cir. 2011).

Given the important differences between exclusion and deportation, aliens (including LPRs) often argued that they were not seeking "entry" when returning from a trip abroad. For example, in United States ex rel. Volpe v. Smith, 289 U.S. 422 (1933), the Supreme Court concluded that a resident alien who briefly travelled to Cuba sought "entry" (and was therefore excludable) upon his return. Id. at 425-26. Volpe strictly construed "entry" to cover "any coming of an alien from a foreign country into the United States whether such coming be the first or any subsequent one." Id. at 425. Following that decision, "cases in the lower courts applying the strict re-entry doctrine to aliens who had left the country for brief visits . . . were numerous[.]" Fleuti, 374 U.S. at 453-54.

In the Immigration and Nationality Act ("INA") of 1952, Congress defined "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise[.]" 8 U.S.C. § 1101(a)(13) (1952). Notwithstanding this statutory codification of the Volpe principle, Congress included in the 1952 act a special exception for LPRs who did "not intend[]" to leave the country:

7

> [A]n alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary[.]

Id.

This "not intended" language in the former Section 1101(a)(13) was the subject of the Supreme Court's decision in Fleuti. In light of Congress' apparent effort to "ameliorate the severe effects of the strict 'entry' doctrine," the Court concluded that Congress did not intend "entry" to cover an LPR's return from an "innocent, casual, and brief" trip abroad because such trips were not "meaningfully interruptive of the alien's permanent residence." Fleuti, 674 U.S. at 462. Fleuti further identified several relevant factors that might indicate whether the trip was "meaningfully interruptive," including its length, the purpose of the visit, and whether the alien had to "procure any travel documents in order to make his trip." Id.

Although the Court had originally granted certiorari to "consider the constitutionality" of the statute as applied to Fleuti, the Court's decision was solely a matter of statutory interpretation. Id. at 451 ("[W]e have concluded that there is a threshold issue of statutory interpretation . . . , the

8

existence of which obviates decision here as to whether [INA] § 212(a)(4) is constitutional as applied to respondent."). In short, the Court specifically declined to address a constitutional basis, as opposed to a statutory basis, for its decision.

In 1996, Congress "made major changes to immigration law" via IIRIRA. William v. Gonzales, 499 F.3d 329, 330 (4th Cir. 2007). Among other things, "Congress abolished the distinction between exclusion and deportation procedures and created a uniform proceeding known as 'removal.'" Vartelas, 132 S. Ct. at 1484. Congress also excised the word "entry" from the statute, replacing the concept with "admission." See id. Perhaps most importantly for our purposes, the new statute eliminated the presumption that any return from a trip abroad requires an LPR to seek "admission" (or, under the old parlance, seek "entry"). Under IIRIRA, "[a]n alien lawfully admitted for permanent residence in the United States" is not treated as one seeking "admission" "unless" one of six statutory conditions is met. See 8 U.S.C. § 1101(a)(13) (emphasis added).[2] In Othi's case,

---

[2] In relevant part, the statute reads as follows:

(C) An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien--

(Continued)

9

the critical exception is subsection (v), which applies to aliens who have been convicted of crimes of moral turpitude or crimes related to controlled substances. Id. §§ 1101(a)(13)(C)(v), 1182(a)(2). These IIRIRA changes became effective on April 1, 1997. See IIRIRA, Pub. L. No. 104-208, § 309(a), 110 Stat. 3009 (1996).

Even though IIRIRA merged deportation and exclusion proceedings, aliens "seeking an admission" and aliens not "seeking an admission" are still treated differently. "Now, as before, the immigration laws provide two separate lists of substantive grounds, principally involving criminal offenses,

---

(i) has abandoned or relinquished that status,

(ii) has been absent from the United States for a continuous period in excess of 180 days,

(iii) has engaged in illegal activity after having departed the United States,

(iv) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this chapter and extradition proceedings,

(v) has committed an offense identified in section 1182(a)(2) of this title, unless since such offense the alien has been granted relief under section 1182(h) or 1229b(a) of this title, or

(vi) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.

for [deportation and exclusion/inadmissibility]." <u>Judulang v. Holder</u>, 132 S. Ct. 476, 479 (2011). These two lists are "sometimes overlapping and sometimes divergent." <u>Id.</u>; <u>see also</u> Nancy Morawetz, <u>The Invisible Border: Restrictions on Short-Term Travel by Non-Citizens</u>, 21 Geo. Immigr. L.J. 201, 206-07 (2007) (describing the "gap" between rules of deportability and rules of inadmissibility). For purposes of the case at bar, by arguing that he never sought "admission," Othi is effectively seeking the benefit of the more alien-favorable list of grounds for deportation.

B.

With this statutory and caselaw background in focus, we now turn to the issue in this case, an issue of first impression in our circuit.[3] That issue is whether Section 1101, as amended by IIRIRA, still allows for the case-by-case analysis of an alien's

---

[3] In describing one of our prior decisions, the Ninth Circuit opined that we "held that the <u>Fleuti</u> doctrine ha[d] not survived IIRIRA's revision of INA § 101(a)(13)." <u>See</u> <u>Camins v. Gonzales</u>, 500 F.3d 872, 878 (9th Cir. 2007) (citing <u>Olatunji v. Ashcroft</u>, 387 F.3d 383, 395-96 (4th Cir. 2004)). We do not read <u>Olatunji</u> as having reached that issue. In <u>Olatunji</u>, the parties had all assumed that IIRIRA had dispensed with <u>Fleuti</u>, 387 F.3d at 395-96, but we had no cause to actually decide, and did not decide, the continuing vitality of <u>Fleuti</u>. "A point of law merely assumed in an opinion, not discussed, is not authoritative." <u>In re Stegall</u>, 865 F.2d 140, 142 (7th Cir. 1989). We do make that decision today.

11

intent under Fleuti when determining whether the alien is "seeking an admission" for purposes of removal proceedings.

We begin, as always in deciding questions of statutory interpretation, with the text of the statute. See United States v. Ashford, 718 F.3d 377, 382 (4th Cir. 2013). Unless Congress indicates otherwise, "we give statutory terms their ordinary, contemporary, common meaning." United States v. Powell, 680 F.3d 350, 355 (4th Cir. 2012) (internal quotation marks omitted). "To determine a statute's plain meaning, we not only look to the language itself, but also the specific context in which that language is used, and the broader context of the statute as a whole." Country Vintner of N.C., LLC v. E. & J. Gallo Winery, Inc., 718 F.3d 249, 258 (4th Cir. 2013).[4]

The statute reads, in relevant part, that "[a]n alien lawfully admitted for permanent residence in the United States

_____

[4] When reviewing the Board's interpretation of IIRIRA, we follow the Chevron framework. See generally Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984); see also Patel v. Napolitano, 706 F.3d 370, 373-74 (4th Cir. 2013) ("[B]ecause the [Board] possesses delegated authority from the Attorney General to administer the INA, the [Board] should be accorded Chevron deference as it gives ambiguous statutory terms in the INA concrete meaning through a process of case-by-case adjudication." (internal quotation marks and alterations omitted)). Step one of that framework requires us to consider "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. As our statutory analysis reflects, Congress has indeed spoken directly to the issue at hand, so we need not proceed further in the Chevron analysis to decide this case.

12

shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien" falls into one of six categories. 8 U.S.C. § 1101(a)(13)(C) (emphasis added). One of the six categories, for example, applies to aliens who have "been absent from the United States for a continuous period in excess of 180 days." Id. § 1101(a)(13)(C)(ii). In other words, an alien absent for 179 continuous days is not regarded as "seeking an admission" by virtue of that absence, but an alien absent 181 days is so regarded. The pertinent category here, though, is the statutory category that applies to aliens who have committed certain offenses, which include the offenses for which Othi was convicted. Id. § 1101(a)(13)(C)(v).

Noting the statute's "shall not . . . unless" language, Othi argues that IIRIRA left the Fleuti doctrine in place. In his view, the statute (as amended by IIRIRA) only lists instances in which an alien may be regarded as "seeking an admission," not when an alien must be so regarded. Assuming this permissive approach, and given that the statutory text does not directly mention Fleuti, Othi maintains that he may still invoke the Fleuti doctrine to avoid a finding of "admission."

Othi's reading of IIRIRA has, however, been rejected by all the courts of appeal considering the issue. While the circuits

13

have all reached the same result, they have done so in different ways.

The First and Fifth Circuits concluded that IIRIRA's plain language ended the Fleuti doctrine. See De Vega v. Gonzales, 503 F.3d 45, 48 (1st Cir. 2007) ("[W]e find the statute plain on its face."); Malagon de Fuentes v. Gonzales, 462 F.3d 498, 501 (5th Cir. 2006) ("The plain language of the statute does not allow for the exception found by the Court in Fleuti."). Likewise, the Seventh, Tenth, and Eleventh Circuits seemed to find the statute unambiguous, even though those courts did not expressly rely on the statute's plain language. See Poveda v. U.S. Att'y Gen., 692 F.3d 1168, 1175 (11th Cir. 2012) ("[IIRIRA] altered the law for permanent residents who returned to the United States after an 'innocent, casual, and brief excursion' abroad."); Tapia v. Ashcroft, 351 F.3d 795, 799 (7th Cir. 2003) ("The physical presence requirements under the IIRIRA does not include the 'innocent, casual, and brief' standard."); Rivera-Jimenez v. Immigration & Naturalization Serv., 214 F.3d 1213, 1218 (10th Cir. 2000) (finding that Fleuti analysis was "irrelevant . . . in light of the IIRIRA's special rules relating to continuous physical existence")

Taking a different tack, the Second, Third, and Ninth Circuits found that the statutory language was ambiguous, but nonetheless determined that Congress had impliedly repealed the

14

_Fleuti_ doctrine.  See _Vartelas v. Holder_, 620 F.3d 108, 117 (2d Cir. 2010), _vacated on other grounds by_ 132 S. Ct. 1479 (2012); _Camins_, 500 F.3d at 879-80; _Tineo v. Ashcroft_, 350 F.3d 382, 395-96 (3d Cir. 2003).

We now join our sister circuits and hold, based on the plain text of the statute, that the _Fleuti_ doctrine did not survive IIRIRA's enactment.

Under Section 1101(a)(3), an "alien" is "any person not a citizen or national of the United States."  Under this broad definitional class of noncitizens, LPRs are included within the ambit of all aliens, and all aliens are deemed to seek "admission" upon their "lawful entry" into the United States. _Id._ § 1101(a)(13)(A).  An LPR would therefore be deemed "admitted" into the United States whenever entering the country from abroad -- because they are definitionally part of the broad statutory class of "aliens" -- unless Congress otherwise exempts them elsewhere in the statute.

Congress did just that in Section 1101(a)(13)(C).  There, Congress provided that "[a]n alien lawfully admitted for permanent residence in the United States shall _not_ be regarded as seeking an admission into the United States[.]"  _Id._ § 1101(a)(13)(C) (emphasis added).  Thus, LPRs are _generally_ exempt from the statutory classification of all other "aliens" for purposes of an "admission" designation.  Had Congress

15

stopped there, Othi's argument would have merit: as an LPR, he would be considered -- under the plain terms of the statute -- exempt from the admission definition.

However, Congress did not stop there and limited the LPR exemption in specific and clear terms -- principally by creating exceptions to the LPR exemption. Relevant here, the general exemption from "admission" applies to all LPRs "unless the alien. . . has committed an offense identified in § 1182 (a)(2) of this title". Id. § 1101 (a)(13)(C)(v) (emphasis added). Othi falls within this category of LPRs because he indeed committed offenses enumerated in Section 1182(a)(2). So rather than benefiting from the general exemption granted to LPRs, aliens like Othi fall back into the general class of "aliens" and are treated as all other aliens for "admission" purposes.

Under the plain language of the statute, Othi is excluded from the exemption granted to LPRs from admission status. He is therefore treated as "seeking admission into the United States," just as are all other aliens entering the country. Accordingly, upon his entry into this country from India on January 11, 2012, Othi was "seeking admission into the United States" and was subject to removal because of his criminal history.

Because Congress has spoken clearly and without reservation, no further analysis is required. The plain meaning of the statute settles the issue at controversy. See Ignacio v.

16

_United States_, 674 F.3d 252, 257 (4th Cir. 2012) ("[A]bsent an ambiguity in the words of a statute, our analysis begins and ends with the statute's plain language.").

Othi argues in opposition that the "shall not . . . unless" statutory construction has been read as permissive when used in some other statutes. Although another context in another statutory setting might permit a different reading, it has no effect on what Congress plainly stated in IIRIRA. _See_ _Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S_, 132 S. Ct. 1670, 1681 (2012) ("The meaning of the phrase ultimately turns on its context."). As an LPR who has committed the statutorily enumerated offenses, Othi is categorically excluded from claiming the status of other LPRs as to whether he was seeking "admission" upon entry into the United States.[5]

---

[5] Congress made a conscientious decision to strip out all of the statutory underpinnings of _Fleuti_, including the words "entry" and "intended." Although Congress can change statutory text without changing the law in some instances, _see_ _Brown v. Thompson_, 374 F.3d 253, 259 (4th Cir. 2004), we cannot say that Congress took that restrained approach here given the wholesale revisions that it made in IIRIRA. Instead, we apply the ordinary presumption that, "[w]hen Congress acts to amend a statute, . . . it intends its amendment to have real and substantial effect." _Pierce Cnty. v. Guillen_, 537 U.S. 129, 145 (2003) (internal marks omitted); _see also_ _Nalley v. Nalley_, 53 F.3d 649, 652 (4th Cir. 1995) ("When the wording of an amended statute differs in substance from the wording of the statute prior to amendment, we can only conclude that Congress intended the amended statute to have a different meaning."). And, as we have said before, we are "no more free to interpolate a word that the legislature has removed by amendment than [we] would
(Continued)

17

C.

We would reach the same result even if we did not find the statute's text to be plain, as principles of administrative deference under Chevron would compel us to do so. This case presents a straightforward question of statutory interpretation under the INA, and the Board's "interpretations of the INA are entitled to deference and must be accepted if reasonable." Viegas, 699 F.3d at 801; see also Patel, 706 F.3d at 373-74 (explaining how and why Chevron deference applies to the Board's interpretations of the INA). The Board has concluded that Fleuti is superseded, see Collado-Munoz, 21 I. & N. Dec. at 1065-66, and we find that decision to be reasonable.[6] As the Third Circuit noted, substantial evidence in the legislative history and the broader statutory context indicates that Congress was aware of Fleuti and deliberately chose to exclude the "brief, casual, and innocent" portion of the decision from the new statute. See Tineo, 350 F.3d at 392-94. We also note the historical background against which this amendment was passed; Congress might have chosen a "shall not . . . unless"

_____

have been warranted in ignoring that word before the amendment was made. Especially is this true if the word removed has a history of judicially established significance." Gkiafis v. Steamship Yiosonas, 342 F.2d 546, 552 (4th Cir. 1965).

[6] For the same reason, we cannot agree with Othi when he suggests that the Board's decision was arbitrary and capricious.

18

construction to reemphasize that it was reversing a presumption (the presumption towards "entry") that had previously existed. And the Board's construction serves the most obvious purpose behind Congress' amendments: promoting uniformity through objective, uniform standards. All these reasons, paired with the text that we have already considered, would prevent us from overturning the Board's decision even if we had not found the plain language of the statute controlling.[7]

D.

Othi also contends that IIRIRA could not have overruled Fleuti because Fleuti is a case determined upon a constitutional principle. He insists that Fleuti's constitutional basis was reaffirmed in a more recent decision, Vartelas v. Holder, 132 S. Ct. 1479 (2012).

This issue need not detain us long because Fleuti was unmistakably not a constitutional case. Congress, of course, has no power to overrule the Supreme Court's constitutional decisions. See, e.g., Dickerson v. United States, 530 U.S. 428, 437 (2000) ("Congress may not legislatively supersede our decisions interpreting and applying the Constitution."). But,

---

[7] Because the Board's construction is reasonable, we would have no occasion to resort to the rule —- pressed by Othi -— that ambiguities are to be construed in the alien's favor. See Suisa v. Holder, 609 F.3d 314, 320 n.7 (4th Cir. 2010).

19

as noted earlier, the Court expressly avoided any constitutional issue in Fleuti. 374 U.S. at 451 (explaining that that the statutory interpretation issue "obviate[d] decision here as to whether [INA] § 212(a)(4) [wa]s constitutional as applied to respondent"). Thus, Fleuti is a statutory interpretation case that Congress is free to supersede by altering the statute. Accord Malagon de Fuentes, 462 F.3d at 503 ("Fleuti is properly read as a case of statutory interpretation, and the statute it interprets has been amended."); Tineo, 350 F.3d at 397 ("[T]he Supreme Court's decision in Fleuti had no basis in constitutional principles; the innocent, casual, and brief departure doctrine was grounded entirely on the meaning of a phrase in the relevant statutory provision in effect at that time.").

Vartelas likewise does not discuss constitutional issues and does not "reaffirm" Fleuti's supposed constitutional status. The case only considered whether IIRIRA retroactively abrogated Fleuti. See Vartelas, 132 S. Ct. at 1483. Like Fleuti before it, Vartelas is a simple case of statutory interpretation.

E.

Lastly, Othi maintains that the Board's interpretation of Section 1101(a)(13)(C) —- and the reading that we adopt today -- violates his due process rights. He suggests that we interpret

20

the statute otherwise to avoid the potential constitutional issue. See, e.g., Legend Night Club v. Miller, 637 F.3d 291, 300 (4th Cir. 2011) ("[A]s a general principle, every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." (internal marks omitted)). And he contends that, even if we have adopted the only permissible reading that the statute will bear, we must act to correct the purported constitutional violation by declaring the statute itself to be unconstitutional as to him. We review constitutional questions like these de novo. Viegas, 699 F.3d at 801.

We must start by noting the extraordinarily deferential standard of review that applies in this context, even as to constitutional questions. "[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." Fiallo v. Bell, 430 U.S. 787, 792 (1977) (internal quotation marks omitted). Our review in immigration matters is "substantially circumscribed" because "control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." Rusu v. U.S. Immigration & Naturalization Serv., 296 F.3d 316, 320 (4th Cir. 2002) (internal quotation marks omitted).

With that standard in mind, we easily find that Othi's due process rights have not been offended. Given his LPR status and

21

his short trip abroad, Othi was owed three considerations before being deemed inadmissible: "(1) notice of the charges against him, (2) a hearing before an executive or administrative tribunal, and (3) a fair opportunity to be heard." United States v. El Shami, 434 F.3d 659, 665 (4th Cir. 2005) (internal quotation marks omitted); see also Kwong Hai Chew v. Colding, 344 U.S. 590, 596-98 (1953).

Othi received all of these considerations and thus received all the process that he was due: he received written notice, had a full hearing before an immigration judge, and had multiple opportunities to press his arguments. Othi suggests that he never received a fair opportunity to be heard because he was not afforded an opportunity to offer "Fleuti evidence." (Opening Br. 38.) But the opportunity to be heard does not include the opportunity to present irrelevant evidence. Cf. United States v. Powers, 59 F.3d 1460, 1470 (4th Cir. 1995) (stating, in criminal context, that "the Fifth Amendment right to due process of law require[s] only that the accused be permitted to introduce all relevant and admissible evidence" (emphasis in original)). And, at least post-IIRIRA, Fleuti evidence is plainly irrelevant evidence.

We are also not persuaded that Othi received inadequate notice of the change in the law that rendered him inadmissible upon his return. "All citizens are presumptively charged with

22

knowledge of the law." <u>Atkins v. Parker</u>, 472 U.S. 115, 130 (1985). Thus, to satisfy due process, "a legislature [generally] need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply." <u>Texaco, Inc. v. Short</u>, 454 U.S. 516, 532 (1982). IIRIRA was passed and became effective before Othi's conviction for second-degree murder and over a decade before his decision to leave the country. Congress therefore provided Othi with all the notice that he was due.

In short, we find no constitutional infirmity with our reading of the relevant statute.[8]

III.

For all these reasons, Othi's petition for review of the Board's decision is

DENIED.

---

[8] Othi briefly objects to his mandatory detention pending removal proceedings, suggesting that the detention is (somehow) a reason to deem Section 1101(a)(13)(C) unconstitutional. The Supreme Court has already said that similar detention does not present due process concerns. <u>See</u> <u>Demore v. Kim</u>, 538 U.S. 510, 526-31 (2003). For those same reasons, we believe that mandatory detention does not present due process concerns here. Even if the detention was problematic, Othi should have directed his challenge to the detention statute, not the statute defining admission.